**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 15-cr-394-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.    DARYL FRANCIS YUREK
2.    WENDY MARIE YUREK**

      Defendants.

---

## ORDER ON MOTIONS TO DISMISS INDICTMENT

---

This matter is before the Court on Defendants' Motion to Dismiss as a Result of Claim and Issue Preclusion (ECF No. 147) and Motion to Dismiss—Judicial Estoppel (ECF No. 148), both of which seek dismissal of all claims against both Defendants.  For the reasons explained below, both motions are denied.

## I.  BACKGROUND

The criminal charges in this case arise from the Defendants' (the "Yureks") alleged tax evasion and bankruptcy fraud, committed in the context of communications with the Internal Revenue Service ("IRS") regarding their tax liability, as well as in a subsequent bankruptcy proceeding precipitated by that tax liability.

The instant motions argue, based on three separate legal doctrines, that the alleged misconduct or wrongdoing underlying the present criminal charges against the Yureks was already raised and resolved in their bankruptcy case, and that as a result the subsequent criminal prosecution is foreclosed.  Accordingly, the Court's analysis

begins by setting out the relevant history of the bankruptcy proceedings, followed by summarizing the present criminal charges.

## A.    Bankruptcy Proceedings

The Yureks had unpaid federal income tax liabilities for 1999 and 2004. The IRS rejected their offers in compromise between 2006 and 2010. In 2009, the IRS conducted audits of the Yureks and two business entities affiliated with them (Bolder Venture Partners, or "BVP," and Veracity, LLC ("Veracity"). The Yureks then filed a Chapter 7 bankruptcy petition on September 1, 2010. The principal liabilities declared in their bankruptcy case were their tax liabilities, then totaling $1,266,187 ($1,185,023 for 1999, and $81,164 for 2004).

On October 4, 2010, a Meeting of the Creditors was held in the bankruptcy case, pursuant to 11 U.S.C. § 341(a). At that meeting, a representative of the IRS questioned the Yureks about certain matters, including: establishing that Daryl Yurek was paid as the General Manager of Veracity (ECF No. 147-1 at 1); asking whether the Yureks had income from any sources not listed in their bankruptcy petition (*id.* at 2); establishing that their health insurance was provided by their son's company, at no cost to them (*id.* at 8); inquiring about "a loan account" provided to the Yureks by Veracity (*id.* at 148-1); and asking several questions regarding their claim that they continued to live in a residence rented from one of their sons, despite being $79,200 in arrears on paying rent, a fact they attributed to their son being "a patient landlord" (*see id.* at 2–3, 8).

On February 10, 2011, the bankruptcy court entered a general discharge pursuant to 11 U.S.C. § 727. (ECF No. 47-6.) Boilerplate language accompanying the

discharge recited that as a general rule, and subject to exceptions, "[d]ebts for most taxes" are commonly not discharged. (ECF No. 47-6 at 2.)

After the discharge was entered, the Chapter 7 Trustee (the "Trustee") identified certain concerns. These included: whether the Yureks had "made a false oath" during the bankruptcy proceedings; whether assets nominally owned by their son—particularly their residence—were actually owned by the Yureks; the nature of the loan(s) from Veracity; and concerns with the ownership or transfer of stock in another affiliated company, ID Watchdog, Inc. ("ID Watchdog"):

> From the Trustee's investigation to date, it appears that several areas of inquiry are necessary to determine whether the Debtors made a false oath in connection with this case. Specifically, the Debtor's statements and schedules and their testimony at the § 341 meeting indicate that their son Justin Yurek acquired an ownership interest in Veracity Credit Consultants while in his early 20's, and acquired real property at 1450 Wynkoop, Unit 6D, Denver, Colorado, for $1,300,000 at age 27. The Debtors state they have no ownership interest in either of these assets. The Debtors testified that they rent the real property from Justin Yurek, but were in arrears in the rent by some $79,200.00. The Trustee wishes to further investigate the history of the ownership interests in Veracity Credit Consultants to determine how the entity was capitalized and by whom, and to investigate the source of the funds used to purchase and pay encumbrances on the real property. The Debtors indicated in their Schedule D that Veracity made a $500,000 loan to them secured by stock in ID Watchdog valued at $85,000.
>
> According to their Schedule B, the Debtors own an entity known as Bolder Venture Partners, LLP, which in turn owns stock in ID Watchdog. Daryl Yurek is the CEO of record of ID Watchdog. ID Watchdog is currently registered with the Colorado Secretary of State as a Cayman Islands corporation. The Trustee wishes to investigate the Debtors' relationship with ID Watchdog, the pledge of the ID Watchdog stock to Veracity, and related matters.

(ECF No. 147-2 at 1–2.)

Given these concerns, the Trustee requested an extension of the deadline to object to discharge of the Yureks' debts, which the Court granted. (ECF No. 147-2.)[1] Shortly before the statute of limitations for the Trustee to bring an action to recover would have run, the Trustee reached a settlement with the Yureks as to certain disputes. (ECF No. 147-3.) The settlement agreement specifically addressed two matters, including (1) whether postpetition payments to the Debtors from BVP "are income from personal services or distributions on account of the Debtors' equity interest and property of the bankruptcy estate," and (2) whether the Yureks' transfer of shares of ID Watchdog to their sons within two years of their bankruptcy petition, "constitute[d] a preferential or fraudulent conveyance avoidable and recoverable by the Trustee for the benefit of the Debtors' bankruptcy estate pursuant to 11 U.S.C. §§ 544, 547, 548 or 551." (ECF Nos. 147-3, 147-4.)

In settlement of these disputes, the Yureks agreed to pay the Trustee $15,000 cash "in full satisfaction of [the] Trustee's claims to distributions to the Debtors from [BVP] and to avoid and recover the ID Watchdog, Inc. stock or the value thereof from [the Yureks' sons]." (ECF No. 147-4 at 2, ¶ 2.) The agreement included a mutual release of claims as between the Yureks, their sons, and the Trustee; it explained that

---

[1] Certain of the materials from the bankruptcy proceeding have been docketed as exhibits to the Yureks' Motions. (*See generally* ECF Nos. 147, 148.) In addition the Court takes judicial notice of the bankruptcy case docket and filings, *In re Yurek*, No. 10-32476-ABC (Bankr. D. Colo.) (last reviewed June 16, 2017). *See Mid-S. Iron Workers Welfare Plan v. Harmon*, 645 F. App'x 661, 665 (10th Cir. 2016) ("Courts may take judicial notice of proceedings in other courts . . . if those proceedings have a direct relation to the matters at issue." (internal quotation marks omitted)).

the settlement "represents a compromise of disputed claims"; and it reserved that "none of the parties admits liability to the other." (ECF No. 147-4 at 3.)

The bankruptcy court approved the Yureks' settlement with the Trustee, without objection from the IRS. According to the Trustee's Final Report, the IRS was paid $12,773.33 as a creditor in the bankruptcy case. The bankruptcy case was closed on October 25, 2013.[2]

**B.    Criminal Charges**

The Indictment in this case was filed on October 7, 2015, not quite two years after the bankruptcy case was closed. It charges five counts of criminal conduct related to the Defendants' tax liability, their communications with the IRS, and their bankruptcy case. (*See generally* ECF No. 1.) The Yureks are jointly charged (in Counts 1 and 2) with tax evasion in violation of 26 U.S.C. § 7201, and with filing a bankruptcy petition in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 157(1). In addition, Mr. Yurek is charged with making a false statement under oath in relation to a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2) (Count 3), and with making false

---

[2] A few days before filing the instant motions in this case, the Yureks' bankruptcy lawyer filed a complaint in the closed bankruptcy case, seeking to initiate an adversary proceeding against the IRS. In that filing, the Yureks claim that the criminal prosecution in this case was brought "in bad faith" and argue it constitutes an impermissible attempt to collect debts discharged in the bankruptcy. They request that the bankruptcy court enjoin the criminal proceedings pending here. *See* Complaint for Violation of the Discharge Order Pursuant to 11 U.S.C. [§] 524 (Doc.#94), *In re Yurek*, No. 10-32476-ABC (Bankr. D. Colo. Apr. 19, 2017). As of the date of this Order, the bankruptcy case has not been reopened, and the bankruptcy court has taken no action on the Yureks' complaint. The undersigned was not pleased that the Court learned of this parallel proceeding on its own, rather than being informed of it by counsel in a timely manner. While not knowing the reasons for it, this tactical approach strongly appears to be evidence either of a significant communications problem by one or both sets of counsel, and/or rather less candor and respect for the Court's jurisdiction, authority, and schedule than the Court expects from all counsel.

declarations under penalty of perjury in IRS filings, in violation of 26 U.S.C. § 7206 (Counts 4 and 5).

In broad terms, the charge of tax evasion alleges that the Yureks committed tax evasion by misrepresenting that they had fewer assets and income available to satisfy their tax liability than what they actually owned, and that they used their son and their business entities to shield assets from the IRS and the bankruptcy court, thus illegally evading payment of their outstanding tax obligations.  (*See generally* ECF No. 1 ¶¶ 5–16.)  One central allegation is the claim that the Yureks purchased their residence (a luxury loft in downtown Denver) in their son's name, while continuing to live there. The Government also charges that they at times directed their business entities to pay the mortgage and condominium fees for the loft (*see id.* ¶¶ 16c.–h.,n.), and to pay certain other personal expenses (*see* ECF No. 14 at 4–5).  Further, the Government charges that the Yureks failed to disclose ID Watchdog shares held by Daryl Yurek, that such shares were transferred to their sons for less than full value, and that Daryl Yurek denied having made such transfers in filings with the IRS.  (*Id.* ¶¶ 7, 9, 16k.–m., o., v.–w., y.–z.; *id.* at 13–14.)

As to the bankruptcy proceedings, the Government alleges that both Defendants violated 18 U.S.C. § 157(1) by filing a bankruptcy petition with the purpose of executing or concealing a scheme to defraud, and that Daryl Yurek also made a false statement under oath during a Rule 2004 examination in the bankruptcy case, specifically by denying any non-wage compensation from Veracity, despite its alleged payment of personal expenses.  (ECF No. 1 at 11–12; ECF No. 114 at 11.)

6

## II.  ANALYSIS

A.   *Res Judicata* **(Claim Preclusion)**

The Yureks first argue that the doctrine of *res judicata* (or claim preclusion) bars the present criminal prosecution.  They claim that because the "same nucleus of operative facts" was raised in the bankruptcy case, therefore "[t]he order of discharge operated to end the controversy in favor of the Yureks," and "the Government cannot now re-litigate the matter."  (ECF No. 147 ¶ 22.)

"The doctrine of *res judicata*, or claim preclusion, will prevent a party from litigating a legal claim that was or could have been the subject of a previously issued final judgment.  The principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not have another chance to do so."  *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1239 (10th Cir. 2017) (citations and internal quotation marks omitted).

"To apply claim preclusion, 'three elements must exist: (1) a [final] judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits.'"  *Id.* (quoting *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997)); *United States v. Kunzman*, 125 F.3d 1363, 1366 (10th Cir. 1997), *superceded on unrelated grounds by Slack v. McDaniel*, 529 U.S. 473 (2000), *as explained in United States v. Glover*, 216 F.3d 1088 (table), 2000 WL 743675, at *3 (10th Cir. 2000).  "In addition, even if these three elements are satisfied, there is an exception to the application of claim preclusion where the party resisting it did not have a 'full and fair opportunity to litigate' the claim in the prior action."

*Medtronic*, 847 F.3d at 1239.

The Yureks cite no cases that have applied the doctrine of *res judicata* to bar a criminal prosecution based on a previous bankruptcy case. (*See* ECF No. 147 ¶¶ 17–22.) The Yureks claim that *United Sates v. Rogers*, 960 F.2d 1501, 1507 (10th Cir. 1992) supports application of the doctrine here, but that is not so. *Rogers* addressed only the narrower doctrine of issue preclusion or collateral estoppel, along with double jeopardy and other issues not raised here. *See Rogers*, 960 F.2d at 1505, 1508. The collateral estoppel analysis in *Rogers* turns on different elements, which are addressed below. *See* Part III.B., *infra*.

In fact, five years after *Rogers*, in *Kunzman*, 125 F.3d 1363, the Tenth Circuit held definitively that a bankruptcy discharge did *not* preclude a later criminal prosecution under the doctrine of *res judicata*, on facts very similar to those here. In *Kunzman*, the defendant had perpetrated a Ponzi scheme, and when it collapsed, then filed for bankruptcy. 125 F.3d at 1364. In an adversary proceeding, the bankruptcy court awarded judgment in favor of victims of the Ponzi scheme, finding their debts and damages were non-dischargeable. *Id.* The defendant was then charged criminally and pled guilty. *Id.* In a *habeas* petition, she argued that the bankruptcy discharge should have precluded the subsequent criminal prosecution. The Tenth Circuit rejected this argument. Relying on *United States v. Tatum*, 943 F.2d 370, 381 (4th Cir. 1991), *Kunzman* held that "[t]he claims raised in defendant's bankruptcy were not identical to those raised in the criminal case." *Id.* at 1266. "A bankruptcy proceeding and a criminal prosecution are fundamentally different proceedings, both in purpose and

procedure, and the 'causes of action' resolved by each are totally different."

*Id.* (quoting *Tatum*, 943 F.2d at 381).  Put another way, the bankruptcy court is not an "appropriate tribunal" in which the Government could have raised or resolved alleged criminal liability.  *See Medtronic*, 847 F.3d at 1239.

Therefore, under *Kunzman*, the Yureks' claim preclusion argument is foreclosed. They neither cite nor distinguish this precedent, and the Court finds it is directly applicable and controlling.  If anything, the defendants in *Kunzman* had a stronger argument for *res judicata* than the Yureks, since the bankruptcy court there entered judgment on the adversary proceeding with the fraud victims, while no similar adjudication occurred here.

Other on-point authority is also uniformly against the Yureks' argument.  The most frequently cited case is *Tatum*, on which *Kunzman* relied.  There, as is alleged here, the defendant concealed assets in his bankruptcy case.  *See* 943 F.2d at 373–74. As here, he then entered into a settlement with the trustee as to alleged fraud.  *Id.* at 381.  Also as here, the IRS did not participate in that settlement and did not object to the discharge, and the IRS took no position when the trustee moved to revoke the discharge.  *Id.*  Just as the Yureks argue here, the defendant in *Tatum* then argued that because the IRS had been a creditor in the bankruptcy it was bound by the discharge and the Government was thereby barred from pursuing the later criminal prosecution for bankruptcy fraud.  *Id.* at 380.  The Fourth Circuit squarely rejected that argument, holding that "a discharge in bankruptcy entered in a bankruptcy proceeding to which the IRS is a claimant does not, under the doctrine of *res judicata*, preclude a subsequent

criminal prosecution for bankruptcy fraud when the IRS never pursued a claim to set aside the discharge in bankruptcy on grounds of fraud." *Id.* at 382. For different reasons, the Ninth Circuit reached a similar result last year. *See United States v. Wanland*, 830 F.3d 947, 956–57 (9th Cir. 2016) ("The purpose of a bankruptcy action is to help those in bad financial positions move forward, not, as with a criminal prosecution, to resolve harms against society deserving of punishment. * * * Thus, the IRS in a bankruptcy action and the United States government in a criminal action are not in privity.").

Taken together with *Kunzman* (which is controlling), the Court finds this authority reflects a uniform rejection of the Yureks' *res judicata* arguments, and they do not address or distinguish this authority. The Yureks instead argue that "the doctrine of claim preclusion has come to incorporate common law concepts of merger and bar," and that the Court should compare the "transactional facts" of the bankruptcy case to those of the Indictment. (ECF No. 147 ¶¶ 19, 21.) The Court finds this argument does nothing to alter the controlling authority to the contrary, first and foremost including *Kunzman*.[3] Their other arguments on this issue are unavailing and the limited authority cited did not address any similar facts or claims.

Finally, the Yureks also argue, in passing, that the Government cannot prove tax evasion under Count 1 of the Indictment, because their tax liability was discharged in the bankruptcy case, leaving the Government unable to prove this necessary element

---

[3] The Yureks' argument asks for analysis under Restatement (Second) of Judgments § 24. But that provision pertains to the doctrine of claim-splitting, which is distinct from the doctrine of *res judicata*. *See Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011).

of the crime, 26 U.S.C. § 7201.  (*See* ECF No. 147 ¶ 22; *see also United States v. Boisseau*, 841 F.3d 1122, 1125 (10th Cir. 2016).)  The Government responds that there is no discharge as to any tax debt which the Government proves was "for a tax . . . with respect to which the debtor[s] made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).  Even assuming the existence of a tax liability is in dispute, this does not present a bar to prosecution under the doctrine of *res judicata*.  At most, this presents a problem of proof for the Government, but does not support the Yureks' argument for dismissal here.  *See United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion.").

## B.    Collateral Estoppel (Issue Preclusion)

The Yureks next argue that all charges against them should be dismissed under the doctrine of collateral estoppel (or issue preclusion).

"Collateral estoppel, or, as it is often known, issue preclusion, bars a party from re-litigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." *Burrell v. Armijo*, 456 F.3d 1159, 1172 (10th Cir. 2006) (internal quotation marks omitted). The Tenth Circuit has established four elements that must be satisfied before issue preclusion applies:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a

> party, to the prior adjudication, and (4) the party against
> whom the doctrine is raised had a full and fair opportunity to
> litigate the issue in the prior action.

*Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000); *see also Rogers*, 960

F.2d at 1508 (same).

The Tenth Circuit has also recognized that "[t]he doctrine of collateral estoppel

may be applicable where the first cause of action was civil and the second was

criminal." *Rogers*, 960 F.2d at 1507; *see also United States v. Modanlo*, 493 B.R. 469,

474 (D. Md. 2013) ("the doctrine [of collateral estoppel] has in fact been applied—albeit,

rarely—in a criminal case when the issue sought to be precluded was initially litigated in

a civil case"). However, Defendants' argument fails here for at least two reasons.

*First*, the issues in the bankruptcy proceeding were not identical to the issues

raised by the five criminal counts charged here. Initially, the Court is not convinced that

the Yureks have shown the misconduct allegedly addressed in the bankruptcy

proceedings was factually "identical" to what is charged here. For instance, while the

Trustee expressed concern that the Yureks had already "made a false oath" as of

December 3, 2010, the Indictment charges Daryl Yurek (in Count 3) with a later false

statement, on January 7, 2011. (*Compare* ECF No. 1 *with* ECF No. 147-2.) While both

the Trustee and the IRS representative asked questions about the ownership of the

Yureks' loft residence, this issue is not mentioned in the settlement reached with the

Trustee, leaving it unclear what factual matters were pursued. (ECF No. 147-4.)

However, assuming for present purposes that all the same factual matters were

raised and addressed in the bankruptcy proceeding, the "issue(s) previously decided"

are still not identical. For purposes of collateral estoppel analysis, the Tenth Circuit has

held that "the issue of whether a [bankruptcy] discharge should be granted is not 'identical' to the issue of whether a defendant is criminally liable." *Kunzman*, 125 F.3d at 1366. Thus *Kunzman* again forecloses the Yureks' argument as to collateral estoppel. *See also United States v. Ledee*, 772 F.3d 21, 31 (1st Cir. 2014) (where defendant had settled claims of misconduct in his bankruptcy case, "[t]he bankruptcy court issued no ruling on the legality of [the defendant's] conduct that could possibly implicate collateral estoppel. * * * The bankruptcy judge did not address the criminality of [defendant's] conduct, and whether [defendant] committed crimes was not 'essential' to the decision approving the [settlement agreement].").

*Second*, to whatever extent the allegations in the bankruptcy proceeding overlapped with the facts charged in the Indictment, those matters were not "fully adjudicated on the merits" in the bankruptcy action. The only form of "adjudication" which arguably occurred was that the bankruptcy court approved the Yureks' settlement with the Trustee and granted discharge. Neither constitutes an adjudication on the merits of any alleged fraud or misconduct.

Whatever allegations or concerns motivated the Trustee's settlement with the Yureks, that settlement agreement did not resolve any issues "on the merits." *See Arizona v. California*, 530 U.S. 392, 414 ("settlements ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect"); *see also Ledee*, 772 F.3d at 31. "[I]ssue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the

judgment.  In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated."  *Arizona*, 530 U.S. at 414 (internal quotation marks omitted).  Moreover, the settlement agreement's own terms stated that it was a compromise and that no party admitted liability.  (*See* ECF No. 147-4.)

As to the entry of the discharge (and the fact that it has not been revoked), this also does not reflect an adjudication on the merits of any alleged criminal acts.  This case is again very similar to *Tatum*, where, the court reasoned:

> [T]he fraud issue was not actually decided by the bankruptcy court.  While a discharge in bankruptcy cannot be entered based on fraud, a discharge order does not resolve the issue of whether fraud occurred.  Fraud may have never been raised or, as here, may have been suggested and the issue thereafter settled by the parties without any adjudication.  The only adjudication necessary to the discharge here was approval of the settlement agreement as an acceptable compromise in the interests of the estate and its creditors.

*Tatum*, 943 F.2d at 382; *see also Ledee*, 772 F.3d at 31; *Modanlo*, 493 B.R. at 475 ("At no point in the bankruptcy proceedings did the Bankruptcy Court actually decide whether [defendant] had misrepresented [facts underlying fraud charges].  Similarly, whether or not [defendant's misrepresentations] were fraudulent was not necessary to the Bankruptcy Court's resolution of any of the Court's rulings.").

Thus, as with the Yureks' *res judicata* arguments, controlling and on-point authority uniformly forecloses their argument for collateral estoppel.[4]

---

[4] The Court also has significant reservations about whether the Government here may be treated as being in privity with the IRS in the bankruptcy case.  But, since the other flaws in the Yureks' collateral estoppel argument make it unnecessary to resolve this question, the Court does not further address it.  *Compare Wanland*, 830 F.3d at 957 (holding "the IRS in a bankruptcy action and the United States government in a criminal action are not in privity," while

## C.    Judicial Estoppel

By separate motion, the Yureks argue that the Court should bar the

Government's prosecution in this case under the doctrine of judicial estoppel.  (ECF No.

148.)  "The Supreme Court first recognized the doctrine of judicial estoppel in *New

Hampshire v. Maine*.  The Court explained that the doctrine's 'purpose is to protect the

integrity of the judicial process by prohibiting parties from deliberately changing

positions according to the exigencies of the moment.'"  *Eastman v. Union Pac. R.R.

Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) (quoting *New Hampshire v. Maine*, 532 U.S.

742, 749–50 (2001)).

"[T]he circumstances under which judicial estoppel may appropriately be invoked

are probably not reducible to any general formulation of principle."  *New Hampshire*,

532 U.S. at 750.  However, three factors "typically inform the decision whether to apply

the doctrine in a particular case," including: (1) that "a party's later position must be

'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in

persuading a court to accept that party's earlier position . . . creat[ing] the perception

that either the first or the second court was misled," and (3) "whether the party seeking

to assert an inconsistent position would derive an unfair advantage or impose an unfair

detriment on the opposing party if not estopped."  *Id.* at 751–51.  Still, these factors "do

not establish inflexible prerequisites or an exhaustive formula," and "additional

considerations may inform the doctrine's application in specific factual contexts."  *Id.* at

---

relying on *United States v. Hickey*, 367 F.3d 888, 892–93 (9th Cir. 2004), which held the United
States in a criminal prosecution was *not* the "same party" as the SEC in prior a civil action) *with*
*Rogers*, 960 F.2d at 1509 (holding the United States *was* the same party as the SEC in a
similar posture).

751.  Judicial estoppel remains "an equitable doctrine invoked by a court at its discretion."  *Queen v. TA Operating, LLC*, 734 F.3d 1081, 1087 (10th Cir. 2013) (quoting *New Hampshire*, 532 U.S. at 750).

In addition, as the Government urges here, the Supreme Court has stated that as a general matter "the Government may not be estopped on the same terms as any other litigant," because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citzenry as a whole in obedience to the rule of law is undermined."  *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984).

Even making the dubious assumption that the IRS or the Trustee acting in the bankruptcy case should be treated as the same "party" as the U.S. Attorney here, the Court cannot find that "clearly inconsistent" positions have been taken.  At no point in the bankruptcy case did the IRS affirmatively state that the Yureks had acted without misconduct, much less that they had not committed a crime.  The most the Yureks can point to are the questions which the IRS representative asked the Yureks during the meeting of the creditors.  However, this never amounted to the IRS taking a position on those matters.  (ECF No. 148-1.)

The Yureks cite no authority in which a criminal prosecution has been judicially estopped in similar circumstances.  They also point to no position taken by the IRS which is "clearly inconsistent" with the present allegations.  They argue only that "[t]he Government had ample opportunity to participate in the bankruptcy process and make any fraud claim known to the Trustee," and that it "did not object to the settlement agreement [with the Trustee] and benefitted from that agreement."  (ECF No. 148 ¶ 26.)

The Court finds that the IRS's decisions to allow settlement and discharge to go forward, or to accept partial payment as a debtor in the bankruptcy case, were not "clearly inconsistent" with the present allegations that the Yureks' committed various crimes. *Cf. Wanland,* 830 F.3d at 956 ("In a bankruptcy proceeding, the IRS is acting as a creditor trying to recover debts. In this capacity, its interests will often differ from the interests of the United States government in a criminal prosecution.")

On this issue, the Court agrees with the First Circuit's analysis in *Ledee.* There, the Court noted that defendant "offer[ed] no case support . . . for his contention that the decision of a bankruptcy trustee or bankruptcy court to settle claims of misconduct in a bankruptcy case . . . can estop the United States Attorney from subsequently filing criminal charges." 772 F.3d at 30. The court went on to conclude that "there simply were no inconsistent positions taken." *Id.* Similar to the facts here, the defendant in *Ledee* had entered into a settlement regarding alleged misconduct in the bankruptcy proceeding. But, as is also true here, "[t]here was no reference in the [settlement] agreement to the possibility of criminal charges." *Id.* Thus, the Court reasoned that the benefit obtained in the settlement was only that defendant "gained protection from the possibility of sanctions under bankruptcy law," but "[w]hile [defendant] may have hoped his belated full disclosure would protect him from prosecution . . . , 'the government'—whether in the persona of the bankruptcy trustee or the United States Attorney—made no such commitment." *Id.* at 30–31. The same facts and analysis apply here, with the same result.

Further, the Court cannot say on this record that any governmental

representative succeeded in persuading the bankruptcy court that no crime had been committed, nor that the IRS received any unfair benefit as a result of the settlement in and discharge in the bankruptcy case.

For all these reasons, and given the telling lack of any supporting on-point authority for the Yureks' argument, the Court cannot conclude that equity supports the application of judicial estoppel in this case. The Yureks' request for the Court to halt the Government's prosecution on that basis is therefore denied.

### III. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Dismiss as a Result of Claim and Issue Preclusion (ECF No. 147) is DENIED; and,

2. Defendants' Motion to Dismiss—Judicial Estoppel (ECF No. 148) is DENIED.

Dated this 19th day of June, 2017.

BY THE COURT:

_____
William J. Martínez
United States District Judge