**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 15-cr-394-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.    DARYL FRANCIS YUREK
2.    WENDY MARIE YUREK**

      Defendants.

---

## ORDER ON *JAMES* PROFFER

---

This matter is before the Court on the Government's *James* Proffer and
Memorandum in Support (ECF Nos. 157 & 158), and Defendants' Response in
Opposition and Request for Pretrial Hearing (ECF No. 159). For the reasons explained
below, the Court's pretrial rulings on the statements proffered by the Government
pursuant to Federal Rule of Evidence 801(d)(2)(E) are set out below, and Defendants'
request for a pretrial evidentiary hearing is denied.

## I. NO HEARING NECESSARY

A district court can "only admit co-conspirator statements if it holds a *James*
hearing or conditions admission on forthcoming proof of a predicate conspiracy through
trial testimony or other evidence." *United States v. Townley*, 472 F.3d 1267, 1273 (10th
Cir. 2007) (internal quotation marks omitted).[1] Therefore, although a hearing is not

---

[1] The Tenth Circuit has very recently described *Townley* as "noting [the] circuit's strong
preference for *James* hearings," *United States v. Alcorta*, 853 F.3d 1123, 1138 (10th Cir. 2017).

required, the Tenth Circuit has expressed a "strong preference" for pretrial *James* proceedings. *Id*. The reason for this preference is that if a court provisionally admits a statement with the caveat that the Government "connect up" the statement to sufficient evidence of a predicate conspiracy at trial, the risk of prejudice to the defendants is high should the Government later fail to meet its burden. *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994). Nevertheless, whether to hold a *James* hearing rests within the Court's discretion. *Id*.

The Court has reviewed the Government's proffer, the parties' briefing on this issue, and other materials already before the Court. Given the extensive nature of the proffer, the fact that documentary and testimonial evidence is already before the court by way of docketed materials, transcripts of testimony, and party filings which make clear that a number of factual issues are either uncontested or beyond reasonable dispute, the Court finds that a hearing is not necessary to resolve the provisional admissibility of the Government's proposed co-conspirator statements in this case, and that, given the findings as to the existence of a conspiracy set out below, Defendants will not face undue risk of prejudice from provisional admission of portions of the Government's proffer, as set out below. Nevertheless, since the Court reserves ruling as to exclusion under Federal Rule of Evidence 403 or other grounds, the Government

---

However, *Townley* referenced a "preference for *James proceedings*," not "hearings." *Townley*, 472 F.3d at 1273 (quoting *United States v. Gonzalez-Montoya*, 161 F.3d 643, 648 (10th Cir. 1998)). In any event, the Court is unaware of any controlling case holding that an in-court hearing is required, particularly where, as here, the Court finds in its discretion that the preliminary findings can be adequately determined based on written materials, effectively a "hearing on the papers." *See United States v. Rutland*, 705 F.3d 1238, 1248 n.2 (10th Cir. 2013); *Urena*, 27 F.3d at 1491.

should present as much independently admissible evidence of the predicate conspiracy described below as possible before seeking to admit any statements admissible only under Rule 801(d)(2)(E).

## II.  LEGAL STANDARD

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is "not hearsay" if it "is offered against an opposing party" and it "was made by the party's coconspirator during and in furtherance of the conspiracy."  However, "[b]efore admitting statements into evidence under the coconspirator exception to the hearsay rule, the district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy."  *Alcorta*, 853 F.3d at 1137; *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

Whether this standard is satisfied is a "preliminary question about whether . . . evidence is admissible," meaning the Court "is not bound by evidence rules, except those on privilege," when resolving the question.  Fed. R. Evid. 104(a); *Bourjaily*, 483 U.S. at 178–79.  As the offering party, the Government bears the burden of showing the preliminary facts by a preponderance of the evidence.  *United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993) (*en banc*).

"The court may consider both independent evidence and the statements themselves when making this finding."  *Rutland*, 705 F.3d at 1248; *see also Bourjaily*, 483 U.S. at 180 ("there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both

the defendant and the declarant in the conspiracy"). The Tenth Circuit requires "at most that there be some independent evidence linking the defendant to the conspiracy." *Alcorta*, 853 F.3d at 1142; *see also United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993) ("most courts require some reliable corroborating evidence apart from the coconspirator's statements before those statements may be used"). However, the independent evidence "need not be 'substantial.'" *Alcorta*, 853 F.3d at 142.

## III.  ANALYSIS

The Government has proffered 88 statements that it intends to admit at trial under Rule 801(d)(2)(E). The Court's rulings and analysis here address only the provisional admissibility of these statements under Rule 801(d)(2)(E), subject to the Government "connecting up" these statements with evidence at trial of the predicate conspiracy. *See United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). This Order does not address the admissibility (or lack thereof) of the proffered statements under any other rule or on any other grounds.[2]

### A.    Existence of a Conspiracy

To prove that a conspiracy existed the Government must show: (1) two or more persons agreed to violate the law, (2) the defendants knew the essential objectives of

---

[2] Although the Government recites that its proffer "*generally* does not include statements that the government intends to offer into evidence under rules other than 801(d)(2)(E)" (ECF No. 157 at 2 (emphasis added)), this appears to be a boilerplate statement not specific to the proffer in this case. Many of the proffered statements appear to be materials that are atypical of traditional Rule 801(d)(2)(E) evidence, such as documents transmitted by Defendants to their accountants or other third parties who are not alleged to have been part of any conspiracy. It appears to the Court that many of the "statements" included in the proffer reflect evidence that would more commonly be offered under other rules of evidence. Moreover, Defendants have reserved all objections or grounds for exclusion other than under Rule 801(d)(2)(E). (ECF No. 158 at 1–2, notes A & B.) For all these reasons, this Order does not address the admissibility of any statements in the Government's proffer under any grounds other that Rule 801(d)(2)(E).

4

the conspiracy, (3) the defendants knowingly and voluntarily participated in the conspiracy, and (4) the alleged co-conspirators were interdependent. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). To prove knowledge of the essential objectives of a conspiracy, the Government does not have to show the defendants knew all the details or all the members of a conspiracy. *Id.* "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged co-conspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (citing *United States v. Evans*, 970 F .2d 663, 669 (10th Cir. 1992). "The core of a conspiracy is an agreement to commit an unlawful act." *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir. 1991). However, the Government need not prove that the conspiracy was for an unlawful purpose, and the element of illegality can be established from the declarations themselves. *United States v. Martínez*, 825 F.2d 1451, 1452 (10th Cir. 1987). Direct evidence is not required, and the conspiracy may be inferred from circumstantial evidence. *United States. v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986) (citations omitted).

Defendants are jointly charged, in Counts 1 and 2, with tax evasion, 26 U.S.C. § 7201, and bankruptcy fraud, 18 U.S.C. § 157(1). Here, despite the lack of a conspiracy charge in the Indictment, the Government contends that Defendants, along with one of their sons, "J.Y.", were part of "an uncharged conspiracy to commit the tax evasion and bankruptcy fraud schemes charged in the Indictment." (ECF No. 157 at 1.)[3] Defendants argue that there was no conspiracy.

---

[3] The Indictment need not charge Defendants with a conspiracy to commit the crimes with which they are charged for evidence to be admitted under Rule 801(d)(2)(E). *See Rutland*,

The Court finds that the Government has met its burden of showing by a preponderance of the evidence the existence of a conspiracy between Defendants to commit tax evasion, 26 U.S.C. § 7201, and to file a bankruptcy petition in furtherance of a scheme or artifice to defraud, 18 U.S.C. § 157(1).  A preponderance of the evidence also shows that J.Y. was a participant in the conspiracy to commit tax evasion.[4]  The Court below summarizes facts that are established by a preponderance of the evidence in the present record, which are sufficient to show all four elements necessary for the existence of conspiracy.

It is uncontested that Defendants had joint tax liabilities arising from their 1999 and 2004 federal income tax returns, filed in October 2000 and October 2005, respectively.  (*See, e.g.*, ECF No. 159 at 1–2.)[5]  It is likewise uncontested that they did

---

705 F.3d at 1248; *United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010) ("a prosecutor need not charge a conspiracy to take advantage of Rule 801(d)(2)(E)").  Statements of an uncharged coconspirator may also be admissible under Rule 801(d)(2)(E).  *See United States v. Mascarenas*, 30 F. App'x 784, 790 & n.3 (10th Cir. 2002); *United States v. Davis*, 766 F.2d 1452, 1458 (10th Cir. 1985).

[4] The Court does not find that a preponderance of the evidence shows J.Y. was a co-conspirator to that part of the conspiracy which sought to commit bankruptcy fraud.  However, it is not required for every conspirator to "know of the . . . full extent of the conspiracy [as long as he has] a general awareness of both the scope and the objective of the enterprise." *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999) (brackets in original).  In this case, although the Government has charged the two separate illegal acts of tax evasion and bankruptcy fraud, the inter-relationship of the underlying acts leads the Court to view this as a single overarching conspiracy to commit both crimes, roughly analogous to how a drug conspiracy might have multiple but inter-related illegal objectives (drug distribution, illegal possession and use of firearms, money laundering, etc.).

[5] The Court's findings rely on various materials in the docket, including, among others, the Government's *James* proffer (ECF No. 158), the parties' many recent motions and filings, which both make clear a number of facts that are undisputed and also attach various documents relevant to the charges (*see, e.g.*, ECF Nos. 147, 148, 159), the docketed transcripts of Defendants' testimony at the bankruptcy meeting of the creditors (ECF No. 178-1), and Mr. Yurek's testimony in a Bankruptcy Rule 2004 examination (ECF No. 178-2).  All citations to such docketed materials are to the page number in the CM/ECF header, which

not fully pay this tax liability, and that between 2006 and 2010 they submitted to the Internal Revenue Service ("IRS") several offers-in-compromise seeking to settle and resolve this outstanding tax liability. The IRS rejected those offers, and Defendants then filed a petition for Chapter 7 bankruptcy on September 1, 2010. Their tax liability—at that time, slightly over $1.2 million—was, by far, the largest debt which they sought to discharge in bankruptcy.

Defendants' bankruptcy petition also listed a $500,000 debt owed to Veracity Credit Consultants ("Veracity" and the "Veracity Loan"). Defendants's testimony in the bankruptcy proceedings was that Veracity was owned by J.Y.; Daryl Yurek ("Mr. Yurek") was a salaried Veracity executive; Wendy Yurek ("Ms. Yurek") was also an employee of Veracity, and the Government's proffer reflects that she at times implemented or directed bookkeeping and payment actions. (*See, e.g.*, ECF No. 158 at 21; ECF No. 178-2 at 16; ECF No. 178-1 at 6–7.)[6] As reflected in the bankruptcy petition and Daryl Yurek's testimony, Defendants used the Veracity Loan to pay their "living expenses." (ECF No. 178-2 at 4; *see also* ECF No. 178-1 at 16–17.)

---

sometimes differ from the documents' internal pagination, as with transcripts reproduced on condensed pages or documents that include prefatory pages.

The Court also takes judicial notice of the contents of the dockets and filings in Defendants' bankruptcy case, *In re Yurek*, No. 10-32476-ABC (Bankr. D. Colo.), as well as in the related adversary proceeding, *Yurek v. Internal Revenue Service et al.*, No. 17-1143-EEB (Bankr. D. Colo.) (complaint filed April 19, 2017) (both last reviewed June 30, 2017). *See Mid-S. Iron Workers Welfare Plan v. Harmon*, 645 F. App'x 661, 665 (10th Cir. 2016) ("Courts may take judicial notice of proceedings in other courts . . . if those proceedings have a direct relation to the matters at issue." (internal quotation marks omitted)).

[6] The Government's proffer describes a statement by Mr. Yurek in October 2006, explaining that he did not wish to hold an ownership role in Veracity because he was afraid the IRS might then be able to take the company, given his "IRS issues." (ECF No. 158 at 23.)

As reported by Defendants' testimony and bankruptcy petition, the Veracity Loan was secured by the pledge of shares of stock in a company called I.D. Watchdog ("IDWD"), which the petition valued at $85,000. According to Mr. Yurek's testimony, his only payment on the Veracity Loan prior to seeking to discharge it entirely in bankruptcy was in January 2009, when he transferred approximately $50,000-worth of the already-pledged IDWD stock to Veracity, although evidently, without any corresponding reduction in available credit thereafter. (*See* ECF No. 178-2 at 5.)

The petition further reported that the pledged stock was owned by another company, Bolder Venture Partners ("BVP"). Both BVP and IDWD are entities closely affiliated with Defendants.[7] Mr. Yurek testified that while the Veracity Loan was made to him personally, the disbursements were paid to both his personal bank account to BVP, "depending on where it was needed" at the time. (ECF No. 178-2 at 4.) Elsewhere, he testified that Defendants' and BVP's accounting treated BVP accounts "like our own personal bank account" (ECF No. 178-2 at 13), and acknowledged that he also personally held IDWD stock, which was not disclosed in the bankruptcy petition, and that he was not "sure which shares are which." (ECF No. 178-2 at 4, 10.) In addition, certain credit card debts that Defendants sought to discharge in their personal bankruptcy were incurred for BVP business expenses. (*See* ECF No. 178-1 at 17–19.)

Notwithstanding these facts, Defendants maintained in the bankruptcy

---

[7] IDWD is another company largely owned by J.Y., and where Daryl Yurek held executive and/or director roles, either directly, or with IDWD's "shell holding company," ID Rehab. (*See* ECF No. 178-2 at 8; *see generally* ECF No. 178-1 at 27–28.) Mr. Yurek obtained the IDWD stock at issue in this case through these roles. (ECF No. 178-2 at 7–8.)

There is no dispute that BVP was jointly owned and controlled by both Defendants. (*See, e.g.*, ECF No. 178-2 at 12.)

proceeding that they had never received any kind of compensation from IDWD other than through BVP, did not disclose IDWD stock as an asset other than the $85,000-worth owned by BVP and pledged to secure the Veracity Loan, denied that BVP or Veracity paid their personal or living expenses, and denied receiving "any other type of compensation" from Veracity (except as a loan), other than salary via payroll.  (*See* ECF No. 178-1 at 7, 21.)

The bankruptcy petition also listed and sought to discharge $79,200 owed to J.Y. for unpaid rent on Defendants' residence.  The Government's *James* proffer, their testimony, and other evidence reflect that while Defendants had previously leased the residence from a third party, they held an option to purchase it; shortly after the IRS filed a tax lien against them in December 2005, they approached J.Y. to ask if he would purchase it instead.  (*See* ECF No. 158 at 8; ECF No. 178-2 at 3–4.)  Or, as Mr. Yurek vaguely put it in his Bankruptcy Rule 2004 examination, he "introduced the property to [his] son."  (ECF No. 178-2 at 3.)

J.Y. did purchase the residence, in March 2006, but Defendants continued to live there, and it was never J.Y.'s residence.  However, as of their September 2010 bankruptcy petition, they paid no rent until shortly before they filed for bankruptcy, and thus paid a total of only two months rent over the course of more than four years.  (ECF No. 178-1 at 25.)  The Government's proffer and other evidence reflect that Veracity paid some or all of the mortgage payments for Defendants' residence, including in transactions directed by Ms. Yurek.  (*See* ECF No. 158 at 10, 20, 21, 22).  The proffer also includes J.Y.'s statement that he told Defendants Veracity would pay the mortgage, while Defendants continued to live there.  (ECF No. 158 at 8–10.)  In the

bankruptcy proceeding, Defendants denied any ownership in the residence and sought to discharge the entirety $79,200 in unpaid rent claimed due to J.Y. (*See* ECF No. 178-1 at 25; ECF No. 178-2 at 2–3.)[8] Elsewhere, the Government's proffer reflects that Defendants told other people that the residence was theirs (*id.* at 25), and that J.Y. informed his accountant that he was leasing the residence to Defendants in 2010 or 2011, around or after the time Defendants filed their bankruptcy petition (*id*. at 28).

Finally, the Government's proffer and other materials reflect that Defendants took various steps to direct the transfer of IDWD stock between Mr. Yurek, BVP, Veracity, and to Defendants' sons. The Court finds that the present evidence makes it more probably true than not that these transactions were part of an overall conspiracy to hide this stock as an asset of Defendants, and thus shield it from the IRS and the bankruptcy court.

In sum, on the present record, the Court finds that a preponderance of the evidence establishes the existence of a conspiracy to commit tax evasion and bankruptcy fraud, as charged in Counts 1 and 2 of the Indictment. (*See* ECF No. 1 at 1–12; *see also generally* ECF No. 114 at 2.)

## B.    Membership in the Conspiracy

### 1.    Defendants

A preponderance of the evidence also shows that both Defendants were part of the conspiracy described above. Central acts, including filing tax returns, submitting

---

[8] In his Rule 2004 testimony, Mr. Yurek at one point answered that "Myself and [J.Y.] both owned Defendants' residence (*see* ECF No. 178-2 at 2), but elsewhere Defendants have generally maintained that it was owned solely by J.Y. (*see, e.g.*, *id.* at 2–3; ECF No. 178-1 at 8–9, 25–26).

offers-in-compromise to the IRS, filing the bankruptcy petition, and testifying at the meeting of creditors were jointly undertaken by Defendants, acting as husband and wife and proceeding jointly both with the IRS and before the bankruptcy court. Beyond that, each of them also independently took numerous affirmative acts which the Court finds to be part of the conspiracy and in furtherance of its goals.

2.    J.Y.

A preponderance of the evidence also reflects that J.Y. was a part of that portion of the conspiracy which sought to commit tax evasion. The Proffer and other evidence reflect that he was aware that the Defendants' unpaid tax liability and resulting tax lien prevented them from purchasing the residence in their own name and then actively participated in the decisions and actions by which he purchased the residence in his name. He then participated in the actions which allowed Defendants to live in the property for several years without paying rent, and directing or allowing Veracity to pay some or all of the mortgage. Defendants, in turn, denied that any of this constituted income, compensation, or an asset available to the IRS or to other creditors in their bankruptcy case. The evidence further reflects that J.Y. was aware of and participated in Veracity's actions in providing Mr. Yurek with a company car, while having it titled in his own name.

**C.    Statements Made During the Course and In Furtherance of the Conspiracy**

The third prerequisite for admissibility under Rule 801(d)(2)(E) is that the statements "were made in the course of and in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137.

1.    <u>During the Course of the Conspiracy</u>

"A co-conspirator statement is made 'during the course' of the conspiracy if it is made before the objectives of the conspiracy have either failed or been achieved." *Owens*, 70 F.3d at 1126 (internal quotation omitted); *see also Krulewitch v. United States*, 336 U.S. 440, 442-43 (1949) (holding that a declaration made after the conspiracy's "objectives either had failed or had been achieved" was inadmissible because it was not made pursuant to and in furtherance of the conspiracy). Statements made by co-conspirators during the conspiracy are admissible against a defendant who subsequently joins the conspiracy. *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991). However, to avoid improperly broadening the scope of conspiracy prosecutions, the Court "must carefully ascertain the nature and extent of a conspiracy in determining whether acts or statements can properly be viewed as made during its existence." *Perez*, 989 F.2d at 1579.

Here, the Government argues the conspiracy began "on or about October 13, 2000," when Defendants filed their 1999 tax return, and continued through approximately April 2014. (ECF No. 157 at 10.) The Government also argues that J.Y. was part of the conspiracy beginning in approximately February 2006, when he agreed to "act as the straw purchaser" of the residence, and continuing at least through July 2011, based on when he allowed or directed Veracity to provide Mr. Yurek a company car. (*Id.*)

Defendants argue that the dates alleged by the Government are "greatly exaggerated" and include both earlier and later dates and statements than the record can support. (ECF No. 159 at 10.)

a.     *Beginning of Conspiracy*

As to the beginning of the alleged conspiracy, Defendants argue that because the Indictment charges a single count of tax evasion as to *both* their 1999 and 2004 income taxes, it is impossible for there to have been a conspiracy to evade this combined liability any sooner than April 2005, when the 2004 taxes became due.  (ECF No. 159 at 10-11; ECF No. 158 at 2.)

The Court is not persuaded by this argument.  Tax evasion in violation of 26 U.S.C. § 7201 requires the Government to prove the existence of a substantial tax liability, but the Government need not prove the exact amount owed.  *United States v. Boisseau*, 116 F. Supp. 3d 1242, 1252 & n. 6 (D. Kan. 2015) (citing *United States v. Harrold*, 796 F.2d 1275, 1278 (10th Cir. 1986)), *aff'd* 841 F.3d 1122 (10th Cir. 2016). Thus, "there is no requirement that an indictment under § 7201 specify the exact amount owed."  *Harrold*, 796 F.2d at 1278.  Moreover, it is "permissible under section 7201 to charge tax evasion covering several years in a single count as a 'course of conduct' in circumstances where the underlying basis of the indictment is an allegedly consistent, long-term pattern of conduct directed at the evasion of taxes for these years."  *United States v. Root*, 585 F.3d 145, 151 (3d Cir. 2009).  Here, there is no real dispute that Defendants owed a substantial tax liability beginning in 2000, when their 1999 tax liability went unpaid.  The Court does not see how the addition of even more unpaid liability in 2005 implies that a conspiracy to evade the 1999 liability could not already have been underway.  Subsequent efforts to evade payment of the combined 1999 and 2004 tax liability merely constituted further acts in a single course of conduct.

As it happens, however, the Government's *James* proffer lists only two "statements" before January 2006 (Statements 1 & 2), and the Court finds the Government has not shown they are admissible under Rule 801(d)(2)(E) for other reasons, described below.  The next earliest statements in the Government's *James* proffer are from January 2006.  It is therefore sufficient for present purposes that a preponderance of the evidence establishes that the conspiracy began not later than January 2006, when Defendants were communicating with their accountants to prepare an offer-in-compromise for submission to the IRS, following the IRS's imposition of a tax lien in December 2005 (ECF No. 158 at 4–7), and around the same time Mr. Yurek communicated with J.Y. about purchasing Defendants' residence (ECF No. 158 at 4–10).

     b.    *End of Conspiracy*

The Government argues that the conspiracy continued through approximately April 2014 (ECF No. 157 at 10), while Defendants argue that their tax liability was discharged by the bankruptcy court on February 11, 2011, and therefore any conspiracy could not have continued past that date, when its alleged objective was accomplished. (ECF No. 159 at 12.)

However, there is no effective bankruptcy discharge as to any debt "for a tax . . . with respect to which the debtor[s] . . . willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).  "[W]hether or not a debtor willfully attempted to evade or defeat a tax under 11 U.S.C. § 523(a)(1)(C) is a question of fact." *In re Vaughn*, 765 F.3d 1174, 1180 (10th Cir. 2014).  As the Fifth Circuit has explained, "there are no limitations imposed by § 523 on the non-dischargeable status of these

types of liabilities.  Thus, a tax liability excepted from discharge under § 523(a)(1)(C),
because of a willful attempt in any manner to evade or defeat such tax, is non-
dischargeable as a matter of law, and no additional action is required by the creditor."
*In re Range*, 48 F. App'x 103 (5th Cir. 2002) (table), 2002 WL 31016592, at * 5.  *Accord*
*In re Everly*, 346 B.R. 791, 795 (B.A.P. 8th Cir. 2006) (holding that exception from
discharge under § 523(a)(1)(C) is "self-effectuating," meaning "that no action is required
before the discharge is entered. The debts are excepted from discharge simply
because of the nature of the debts. * * * [T]he scope of a discharge is final when
entered . . . . under § 523, certain debts were excepted from that discharge when
entered.").

 Therefore, if the § 523(a)(1)(C) exception from discharge applies to Defendants'
tax liability, then it was never discharged.  This is true even assuming the Government
did not object to the discharge order at the time, and although the bankruptcy court did
not address the issue.  Non-dischargeability under § 523(a)(1)(C) may be raised and
decided in later, separate, proceedings, and in courts other than the bankruptcy court.
*See, e.g.*, *In re Range*, 2002 WL 31016592, at *2, 5 (affirming 1998 finding in adversary
proceeding that 1983–86 tax liabilities were excepted from 1992 discharge); *In re*
*Everly*, 346 B.R. at 796 (interpreting language of 11 U.S.C. § 523 to explain that "the
bankruptcy court shares jurisdiction with other court of competent jurisdiction over all
other exceptions to discharge," other than those found in § 523(a)(2), (4), or (6), and
that "[a] complaint other than under 11 U.S.C. § 523(c) may be filed at any time").

 As a result, the question of whether Defendants' tax liability was or was not
discharged in bankruptcy remains disputed, and is therefore an issue to be proved by

the Government at trial as part its charge of tax evasion in violation of 26 U.S.C.

§ 7201. *See Bussell v. Comm'r of Internal Revenue*, 130 T.C. No. 13, 240 (2008) ("the

elements necessary for a conviction under section 7201 overlap with the elements

necessary to establish the applicability of the exception to discharge under [§]

523(a)(1)(C)").

Given this analysis, it is possible for Defendants' conspiracy to have continued

after the date of the bankruptcy discharge. The Court finds that a preponderance of the

evidence shows that it did. Although relatively few of the Government's proffered

*James* statements were made after the February 2011 discharge (*see* ECF No. 158 at

41–43, 72–79), the Court concludes that a preponderance of the evidence shows the

conspiracy continued past that date, at least through December 2013, when

Defendants were communicating with their broker to certify that certain IDWD stock was

owned by Veracity, leading to the later sale of that stock, with the proceeds flowing to

Veracity. (ECF No. 258 at 75–78.)[9]

> ### *2.* In Furtherance of the Conspiracy

Last, the Court must determine whether each of the proffered statements was

made "in furtherance of" the predicate conspiracy. "[T]he in-furtherance requirement

. . . embodies the [Rule] drafters' desire to strike a balance between the great need for

conspirators' statements in combating undesirable criminal activity which is inherently

secretive and difficult of proof, and the need to protect the accused against idle chatter

---

[9] The Government argues that the conspiracy continued through the April 2014 sale of these IDWD shares. (*See* ECF No. 157 at 10, 23.) However, the last statement proffered under Rule 801(d)(2)(E) is from December 2013, so the Court need not make any finding here whether the conspiracy continued past that date. (*See* ECF No. 158 at 78.)

of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." *Alcorta*, 853 F.3d at 137 (quoting *Perez*, 989 F.2d at 1578).

"A wide array of statements can fit this requirements." *Alcorta*, 853 F.3d at 1137. "Examples of statements which may be found to satisfy the 'in furtherance' requirement include statements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities." *Perez*, 989 F.2d at 1478. On the other hand, "statements are not in furtherance of the conspiracy if they are mere narratives, that is statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose." *Id.* at 1578 (internal quotation marks omitted).

The Tenth Circuit calls for "a construction of the 'in furtherance' requirement protective of defendants," and applies this test "narrowly." *Id.* The focus is "on the declarant's intent in making the statement," rather than on the statement's effect. *Id.* However, "[n]o talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy. To the contrary, this determination must be made by examining the context in which the challenged statement was made." *Id.* at 1578–79.[10]

---

[10] The Government's briefing argues for a far more sweeping interpretation of the "in furtherance of" requirement. (*See* ECF No. 157 at 7–8.) The Court finds the Government's

Applying this standard, the Court finds the Government has not met its burden of showing that all of the proffered statements were made in furtherance of the conspiracy. The Court organizes its rulings on each of the Government's proffered statements below by categorizing the statements by type and by the Court's determination of their admissibility under Rule 801(d)(2)(E).

### 1.   Document Transmissions

Many of the Government's proffered "statements" are actually transmissions of e-mails or other documents by Defendants to individuals who are not members of the conspiracy, including accountants, stockbrokers, etc. As noted above, the Court is not persuaded that Rule 801(d)(2)(E) provides the most natural basis to analyze the admissibility of this proposed evidence. However, the Court makes no rulings here on any grounds other than Rule 801(d)(2)(E).

### a.   *Not Admissible Under Rule 801(d)(2)(E)*

<u>Statements 1 and 2</u>: Ms. Yurek transmitted a personal balance sheet to Defendants' accountant by fax on January 19, 2001. The Government has not shown how this was in furtherance of the conspiracy. While this transmission occurred not long after Defendants filed their 1999 tax return, there is no allegation that the return itself was improper. The Government has not linked this communication to any other alleged wrongdoing, and has not shown that it was intended to induce some improper conduct, rather than simply transmitting end-of-year accounting in the ordinary course.

argument does not properly reflect the law in the Tenth Circuit. Many of the cases cited are from other circuits, and most precede *Perez*, in which the Tenth Circuit directly addressed the scope of this analysis *en banc*, stating the requirement should be applied narrowly and in a manner that is protective of defendants. In the Court's view, the sweeping application of this analysis proposed by the Government is contrary to spirit and intent of *Perez*.

The Court finds these "statements" are at most "mere narrative" relating to past events or facts generally connected with the conspiracy, but were not made in furtherance of it. *Perez*, 989 F.2d at 1578.

Statements 11–17: In March 2009, Ms. Yurek sent Defendants' broker forms stating that Mr. Yurek was the "CEO" of both IDWD and Veracity and that he had income less than $1 million, and a net worth of more than $1 million. While these representations may be inconsistent with statements made elsewhere, the Government has not shown that they were sent to direct action by the recipient or were otherwise intended to further any goal of the predicate conspiracy. Again, sending representations of fact to a non-conspirator in this fashion appears to be at most a "mere narrative" of facts arguably connected to the conspiracy, but the Government has not shown they were sent with the intent to advance the conspiracy's goals. Accordingly, these documents are not admissible as co-conspirator "statements" under Rule 801(d)(2)(E), although, again, the Court emphasizes that it makes no rulings as to admissibility or exclusion under any other rule.

       b.   *Provisionally Admissible*

Statements 3–7: In contrast to statements 1 and 2, these January 2006 transmissions of financial information from Defendants' to their accountants were sent in the process of preparing Defendants' offer-in-compromise for submission to the IRS. The Court therefore finds that these "statements" were made in furtherance of the predicate conspiracy to commit tax evasion and are provisionally admissible under Rule 801(d)(2)(E).

Statements 10, 18–21, 32, 56–57 & 94–96: These statements include various e-mails and/or document transmissions sent by Defendants, and in some cases by J.Y., to their accountants and brokers.  These communications direct or facilitate particular actions, and/or directly relate to other specific acts which the Government has shown by evidence sufficient at this stage were a part of the predicate conspiracy.  For example, these "statements" include Defendants' directions and inquiries to brokers and a stock certifying entity regarding the transfers of the IDWD stock.  A preponderance of the evidence shows the resulting transactions were part of the predicate conspiracy.

This category of statements also includes J.Y.'s directions or explanations to his accountants about the lease of the residence and the provision of the company vehicle to Mr. Yurek.  Again, the Government has shown that these statements were made in furtherance of the conspiracy to evade taxes by hiding assets and income from the IRS, and they are therefore provisionally admissible under Rule 801(d)(2)(E).

c.    *Ruling Deferred*

Statement 24: The Government proffers as a "statement," a mortgage document dated August 20, 2008 on which Ms. Yurek wrote "Enter in Sage."  The Government's evidence does not establish what "Sage" is, what was intended by this "statement," nor how it was intended to further the conspiracy.  Since the Court literally does not understand what this statement means, ruling under Rule 801(d)(2)(E) is deferred until trial, subject to the Government making a further showing that connects it to the alleged conspiracy, outside the jury's presence, before seeking admission.

Statement 91: On October 28, 2011, Mr. Yurek e-mailed Defendants' bankruptcy attorney attaching documentation of certain IDWD stock transfer transactions.  While it

appears the execution of these transactions was part the conspiracy, the Court cannot determine from the present record whether this transmission to Defendants' bankruptcy attorney directed some action or was made in furtherance of the conspiracy, or simply constitutes "mere narrative" of facts or past events. The Court therefore defers ruling, subject to the Government making a further showing that this "statement" was made in furtherance of the conspiracy, outside the jury's presence and before seeking to admit this evidence under Rule 801(d)(2)(E).

2.   Statements to Third-Party Non-Conspirators

The Government's Proffer also includes a number of statements by Defendants or J.Y. to individuals not alleged to be co-conspirators.

a.   *Not Admissible Under Rule 801(d)(2)(E)*

Statements 27–28, 30–31: These are reported as statements made by Defendants, and in one case by J.Y. to third party non-conspirators. The Government has not established who these individuals are, or how they might or might not be connected to the conspiracy. For example, the Government proffers a statement made by Defendants at a holiday party that the residence was theirs (not J.Y.'s). (Statement 28.) While this might be inconsistent with Defendants' representations elsewhere, the Government neither explains who the listener is, nor shows how a casual statement at a party was intended to further the goals of evading taxes and committing bankruptcy fraud. This appears to be only narrative of facts connected to the conspiracy.

The other statements in this category are similar, including J.Y.'s explanation to a third party that he was able to purchase the residence because "you can finance anything," and Mr. Yurek's reporting to another person in 2007 or 2008 that he owed

21

the IRS money but believed the "statute of limitations" would soon expire.  These statements are at most exposition or narrative, but were not made with the intent to advance the objectives of the conspiracy, and thus are not admissible under Rule 801(d)(2)(E).

      b.    *Provisionally Admissible Under Rule 801(d)(2)(E)*

Statements 23 & 29 are exceptions to the analysis above.  On January 1, 2007, Ms. Yurek reportedly directed another Veracity employee to make a mortgage payment on Defendants' residence, and in 2009, Mr. Yurek reportedly told Dennis Perkins, the CFO (or equivalent officer) at Veracity, that certain transfers of IDWD stock to J.Y. and Defendants' other sons had been gifts.  The Court finds these statements were made in furtherance of the conspiracy and are provisionally admissible under Rule 801(d)(2)(E).

Statements 92 & 93 are statements made by Mr. Yurek to an "E. Anderson" regarding ownership of artwork and furniture.  The Court finds these were made in furtherance of the predicate conspiracy, to the extent it is more likely than not that they were made with an intent to conceal Defendants' assets.  However, given the lack of other directly related evidence and context on these facts, the Court notes that admission of these statements is highly dependent on the need to "link them up" to other admissible evidence that provides context and connects this conduct to the conspiracy.

      c.    *Ruling Deferred*

Statement 26: The Government's proffer reflects a statement made by Mr. Yurek to an "M. Navarro" in approximately October 2006, that he did not want to have an ownership interest in Veracity because he was afraid the IRS would be able to take the

company as part of their investigation of Defendants' personal "IRS issues." (ECF No. 158 at 23.) The Government's evidence does not establish who the listener is, and the Court cannot discern whether this statement was intended to direct a future action advancing the conspiracy, or was merely a reporting a past or present narrative fact. Therefore, ruling is deferred subject to the Government making a further showing outside the jury's presence before seeking to admit it under Rule 801(d)(2)(E).

3.    Statements Among Defendants and J.Y.

Statements 8–9, 22 & 25:  All of these proffered statements between and among Defendants and J.Y. are provisionally admissible under Rule 801(d)(2)(E).  In all of the Government's proffer, these are the statements that most resemble traditional non-hearsay co-conspirator statements to be analyzed under Rule 801(d)(2)(E).  These statements relate directly to Defendants' and J.Y.'s decisions and agreement to take acts advancing the objectives of the conspiracy, including J.Y.'s purchase of the residence in lieu of Defendants, Veracity's payment of the mortgage on the residence, and the arrangements made for Mr. Yurek's company car.  These statements are provisionally admissible under Rule 801(d)(2)(E).

4.    Testimony in Bankruptcy Case

Statements 33–55 & 58–90: All of both Defendants' testimony in the bankruptcy proceedings is admissible under Rule 801(d)(2)(E), including both Defendants' testimony at the October 4, 2010 meeting of creditors, and Mr. Yurek's testimony at the January 7, 2011 Rule 2004 examination.  This testimony was offered directly in furtherance of the predicate conspiracy inasmuch as it constitutes central representations made to the bankruptcy court, and to the IRS as a creditor, and relates

directly to Defendants representations regarding the assets and income allegedly concealed from the IRS and in the bankruptcy proceedings.

The Court notes, however, that certain of the specific statements from Mr. Yurek's January 7, 2011 Rule 2004 testimony, taken in isolation, lack sufficient context and related evidence to be adequately linked to acts furthering the conspiracy and are therefore particularly dependent on "linking up" these statements to other admissible evidence at trial.  For example, while the Court finds that Mr. Yurek's testimony regarding payment of student loan bills owed by one of Defendants' sons, payment of unspecified "personal expenses," and general comments regarding "comingling" personal and BVP accounts (*see* ECF No. 158, Statements 84, 87–89), were all statements made in furtherance of the conspiracy, they will require further factual and evidentiary context at trial.

     5.     <u>July 24, 2009 IDWD Meeting Notes</u>

<u>Statement 97</u> is provisionally admissible under Rule 801(d)(2)(E).  This constitutes a report of Mr. Yurek's representations at a meeting of the board of directors of IDWD when seeking approval to transfer IDWD stock, and for related escrow requirements.  The Court finds this was made in furtherance of the conspiracy inasmuch as it was a statement made to facilitate an affirmative act advancing the conspiracy's objectives.

**D.    Summary of Rulings**

For ease of reference, the Court reiterates and summarizes the rulings explained above in the following table:

| Proffered Statements | Ruling |
|---|---|
| 1-2 | Not admissible under Rule 801(d)(2)(E) |
| 3–10 | Provisionally admissible under Rule 801(d)(2)(E) |
| 11–17 | Not admissible under Rule 801(d)(2)(E) |
| 18–23 | Provisionally admissible under Rule 801(d)(2)(E) |
| 24 | Ruling deferred subject to further showing outside jury's presence |
| 25 | Provisionally admissible under Rule 801(d)(2)(E) |
| 26 | Ruling deferred subject to further showing outside jury's presence |
| 27–28 | Not admissible under Rule 801(d)(2)(E) |
| 29 | Provisionally admissible under Rule 801(d)(2)(E) |
| 30–31 | Not admissible under Rule 801(d)(2)(E) |
| 32–90[11] | Provisionally admissible under Rule 801(d)(2)(E); Statements 84 & 87–89 particularly dependent on "linking up" to other evidence at trial |
| 91 | Ruling deferred subject to further showing outside jury's presence |
| 92–97 | Provisionally admissible under Rule 801(d)(2)(E); Statements 92 & 93 particularly dependent on "linking up" to other evidence at trial |

---

[11] The Government's proffered statements are numbered 1-40 and 50-97; there are no proffered statements numbered 41-49.  (See ECF No. 158 at 35–36.)

## IV.  CONCLUSION

For the reasons set forth above, the Government's *James* Proffer (ECF No. 158) and supporting Memorandum (ECF No. 157), jointly construed as a motion for pretrial rulings on the admissibility of evidence proffered under Federal Rule of Evidence 801(d)(2)(E) is GRANTED IN PART and DENIED IN PART, as described in detail above.  That portion of Defendants' opposing Memorandum which requests a pretrial evidentiary hearing on these matters is DENIED.

Dated this 30th day of June, 2017.

BY THE COURT:

William J. Martinez
United States District Judge